# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00493-CR

**Jereme Rucker, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 147TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-19-201667, THE HONORABLE CHUCK MILLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Jereme Rucker of the offense of aggravated assault with a deadly weapon, assessed punishment at two years' imprisonment, and recommended that Rucker be placed on community supervision. The district court rendered judgment on the verdict and placed Rucker on community supervision for three years. In five issues on appeal, Rucker asserts that the evidence is insufficient to support his conviction, that he did not clearly and unequivocally waive his right to counsel at trial, that the district court failed to investigate appellant's competency to waive his right to counsel, that the district court abused its discretion by failing to order a competency examination and hold a competency trial, and that the district court violated Rucker's right to due process by allowing him to represent himself even though he was incompetent to conduct his own defense. We will reverse the judgment of conviction and remand the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

**The evidence presented at trial[1]**

The State charged Rucker with intentionally or knowingly threatening Desiree Gonzalez with imminent bodily injury and using a deadly weapon during the commission of the offense. At trial, the jury heard evidence that on March 10, 2019, Gonzalez was working at a Jiffy Lube in Austin when she heard yelling and screaming coming from behind the store. When she went outside to check on the commotion, she saw Rucker, a transient man whom she had seen in and around the Jiffy Lube on previous occasions, yelling at four other transient individuals in a grassy area outside a nearby 7-11. Rucker was accusing them of stealing some of his belongings. Gonzalez testified that at one point during the altercation, Rucker pulled out a pocketknife and pointed it at one of the men, causing the man to step back with his hands up.

Gonzalez then went back inside the shop and called 911. Dispatch asked Gonzalez for a description of Rucker's clothing, and she walked back outside to see what Rucker was wearing. Once outside, she told Rucker to "leave everybody alone" and asked the other people to "walk away." According to Gonzalez, this made Rucker "more riled up." She recounted, "So he just got more angry and was yelling more and cussing at us and then that's when it escalated to where he started to come toward me with the knife."

When asked to describe how Rucker was holding the knife, Gonzalez testified, "Holding the knife towards me like if he was going to stab me with it, but as he was walking towards me." She added that Rucker was holding the knife in front of him and "was cussing at me and telling me that I needed to fucking leave him alone and leave his house alone and why

---

[1] We set out the evidence relevant to Rucker's sufficiency challenge, which we must address to determine if Rucker is entitled to a rendition of acquittal. *See Burks v. United States*, 437 U.S. 1, 15–18 (1978).

can't we just leave him alone." When asked if Rucker said anything regarding what "he was going to do to [Gonzalez] with the knife," Gonzalez testified, "He said he was going to cut me and that we just needed to leave him alone." On cross-examination, Gonzalez added that Rucker had told her that he would cut her "if" she came onto his property, which Rucker claimed was the grassy area outside the Jiffy Lube. Gonzales estimated that Rucker was approximately thirty feet away from her at the time he threatened her. Gonzalez explained that she was scared for her life and for the life of a 16-year-old girl, the sister of an auto technician, who was also at the shop that day. According to Gonzalez, the girl "was just going crazy, yelling and screaming, and she started to dart her way towards [Rucker]. And then I just yanked her back and pulled her back into the shop."

Gonzalez testified that she felt threatened by Rucker. When asked why she felt threatened, Gonzalez explained, "I'm not sure if it was because there was a weapon in hand that made it more threatening towards me and him coming towards me is what—just made it seem more realistic. It wasn't a toy. It wasn't a game." She added, "He said he was going to cut me because we keep bothering him and messing with his home. We can't just leave him alone and leave him be." Gonzalez also testified that the threat felt imminent because Rucker "was coming towards me with a knife still talking and screaming and cussing at me as if I hurt or did something to him," and he was acting "like a little hysterically crazy."

When the police arrived, they arrested Rucker and found a pocketknife in his possession. The knife was admitted into evidence. One of the arresting officers described the knife as "a locking bifold knife" with a "single fixed non-serrated blade," a hand guard, and a belt clip. The officer testified that a knife is capable of causing serious bodily injury or death and that the knife found on Rucker was capable of both cutting and stabbing.

3

**Procedural history**

At Rucker's arraignment, Rucker informed the district court that he and his appointed counsel had "irreconcilable differences." Rucker claimed that counsel had "filed motions without telling [him] what they are or anything" and that counsel had been "dismissed in the past" from representing Rucker in other cases. The district court responded, "Let me just say this, I'll cut to the chase and make it real easy for you, you are entitled to the right to be represented by counsel if you can't afford it." Rucker replied, "If I'm going to have an attorney, I would rather have a different attorney, an attorney of my choice." The district court asked Rucker if he could afford an attorney, and Rucker indicated that he could not.

The district court asked counsel if he had irreconcilable differences with Rucker. Counsel told the court that he did not: "In all honesty, I don't have a problem with Mr. Rucker, and I don't think that another lawyer being here is going to make any difference for Mr. Rucker. Mr. Rucker has told me that he wants to represent himself." Rucker responded, "I would be happy to go pro se. I would rather go pro se than—." The district court then interjected and informed Rucker that "if [it] thought that bringing in another attorney would somehow make the process of [Rucker] going to trial smoother, then [it] would do so." However, the district court was not inclined to appoint another attorney to represent Rucker "because the last time we were here off the record," Rucker had "made some indication back and forth" that he wanted to represent himself.

Rucker then asked the district court to recuse itself from the case, which was a request that Rucker had apparently made during the earlier off-the-record hearing. After an extended discussion on recusal, during which the district court informed Rucker that it would

refer his recusal motion to the administrative judge after the arraignment, the district court returned to the subject of representation:

[The court]: So, basically, you want to represent yourself; is that correct?

[Rucker]: I am myself, Your Honor.

[The court]: Do you want to represent yourself?

[Rucker]: I am pro se, Your Honor.

[The court]: All right. So, let me just go over these things with you, and then I will have the case referred for recusal. Okay? So, we already went over the arraignment. You were advised that you are entitled to a lawyer, and if you cannot afford a lawyer, then I will appoint one for you. Do you understand that? In that regard, I have already appointed [counsel].

[Rucker]: I don't understand that, Your Honor.

[The court]: Do you comprehend that?

[Rucker]: I comprehend that I have a right to an attorney.

[The court]: Okay. And, you also have the right to represent yourself. Do you understand that?

[Rucker]: It would appear to me that somebody would have to have dissociative identity disorder or [have] multiple personality disorder for one of them to represent the other. For one person to represent themselves implies a dissociative quality that I don't have. I don't have any mental health disorders. I've been found competent to be in court by Matt Fabian, your forensic psychologist that was appointed to find me competent to go pro se

5

in court.[2]  I am myself.  I am one man.  I myself am a natural man.  I have rights under the Constitution of the United States of America.  I know my rights.  I know the law.

[The court]:    I'll take that as you understand that you have the right to represent yourself.

[Rucker]:    I comprehend.

[The court]:    Okay. I'll take that as you comprehend that you have the right to represent yourself.

[Rucker]:    I am myself, Your Honor.

[The court]:    I got you.

The district court proceeded to conduct a *Faretta* hearing to determine whether Rucker was knowingly and intelligently waiving his right to counsel.  *See Faretta v. California*, 422 U.S. 806, 835 (1975).  At one point during its admonishments to Rucker on the dangers and disadvantages of self-representation, the district court asked Rucker, "Do you understand that you have this attorney [who's] been appointed to you, and that because you lack the funds or the circumstance right now to hire an attorney, that you will have an appointed attorney with you. Do you understand that?"  Rucker responded, "Your Honor, I would like—if I have a right to an attorney, I should have a right to an attorney."  Rucker added that he did not know "whether [he] can trust another attorney that was appointed" and that he "believe[d] that [he] would be better

---

**2**  There is no documentation in the record of any such competency finding.  However, shortly after his arrest, Rucker was evaluated under Article 16.22 of the Code of Criminal Procedure, which provides for "early identification of [a] defendant suspected of having mental illness or intellectual disability."  *See* Tex. Code Crim. Proc. art. 16.22.  The evaluation, which was made over two months prior to Rucker's arraignment and over four months prior to trial, concluded that there was "[n]o indication of a mental neurodevelopmental or neurocognitive disorder requiring jail treatment at this time."

6

off being pro se rather than being represented by an attorney who is going to subvert [his] access to the Court."

After completing its admonishments, the district court asked Rucker again if he wanted to represent himself. Rucker responded,

> Your Honor, again, I believe the term "represent yourself" implies a dissociative quality, a mental disorder. I am one person. I am me. Represent myself against what? Who am I challenging in this court in this case? To be myself, and to fight against this thing—I mean, these are very abstract concepts, and they need to be brought out into open court, and we need to talk about this stuff.

The district court replied, "We're in open court, and we're talking about it. What I need to know from you is, do you want to act as your own lawyer?" Rucker answered, "I want to be me in court. I'm not a lawyer. I'm not an attorney. I am me."

After further discussion, the district court told Rucker, "So . . . if you want to represent yourself, then sign this document. It's a waiver. You can read it, and I will allow you to do that, and I will allow you to represent yourself." The district court explained further, "Basically, it's saying that you understand the rights that you have to an attorney, but you want to represent yourself. Even if you don't want to sign it, that's fine, if you say it on the record, then that's fine. Do you want to represent yourself?" Rucker answered, "I would like to be me in court, Your Honor." The district court asked Rucker again, "Do you want to be you by yourself or with [counsel]?" Rucker replied, "I would consider assistance of counsel of someone to give me legal counsel of some of the processes, but I don't want somebody to be filing motions or moving the Court on my behalf." The district court asked Rucker, "You don't want somebody asking questions for you?" Rucker replied, "Not without me knowing what they are." The district court told Rucker that it would not permit hybrid representation and that Rucker

7

needed to choose one or the other: "Either you represent yourself or you have a lawyer represent you, which one do you want?" Rucker answered, "I would be myself in court. I am pro se in court."

After that, the district court found that Rucker had been advised about the risks and disadvantages of self-representation and had voluntarily and intelligently made the decision to represent himself. The district court informed Rucker that he could withdraw the waiver of his right to counsel at any time, and it kept Rucker's appointed counsel on the case as standby counsel. Rucker and the district court then returned to the earlier discussion of recusal.

Following a recess, Rucker informed the district court, "I don't think I'm going to sign the waiver." The district court responded, "I entered it on your behalf." Rucker replied, "I'm not waiving my right to an attorney." The district court reminded Rucker of its ruling: "What I told you is, I'm granting your request to represent yourself, because you asked to represent yourself, but at any time in the future, if you want to have an attorney, you can have an attorney." Standby counsel then interjected, advising Rucker against self-representation and asking him if there "was somebody else that you would use, or are you only representing yourself because you only don't want me to represent you?" Rather than answer the question, Rucker proceeded to argue with counsel, and the district court concluded the hearing.

After the hearing had concluded, the State filed a motion for a competency examination.[3] The motion alleged the following:

> Immediately on being brought into the courtroom, the defendant, without

---

[3] The record contains an unsigned copy of the motion, file stamped by the district clerk's office on May 30, 2019, the same day as the arraignment.

8

prompting and in a rambling forced monologue, interrupted the Judge continually and said things that raise the issue of his competency to stand trial.

As some few (of many) examples, the defendant stated to the court in the middle of his arraignment more than once "am I being threatened? Are you threatening me?" "I am not understanding anything," "I do not understand why I am here," "Does the State of Texas have a body?" "The State of Texas does not have a body and therefore cannot be injured." "We are all under the influence of a racketeering operation." "We are going to use the 13th Amendment which was meant to free the slaves." "I feel that line of questioning is threatening to me." "I am an abstract thinker."

These ideations and his continual interruption of the Court and his inability to answer even simple questions posed to the defendant by the court, raises the issue of his competency.

WHEREFORE, the State requests that the court conduct an inquiry pursuant to Tex. R. Crim. Proc. 46B.004 and 46B.005 to determine the defendant's competency to stand trial.

The record does not reflect that any competency hearing was held.

Approximately six weeks later, there was another pretrial hearing before a different judge. At this hearing, Rucker filed a motion to quash the indictment, a motion to suppress, and other pretrial motions, which the district court either denied or carried to trial. One week later, the case proceeded to trial before a third judge. Rucker conducted jury selection himself. His presentation to the venire panel included what can be fairly characterized as a rambling and paranoid monologue unrelated to his case, which included the following statements:

Everybody thinks I'm crazy. I'm not crazy. I talk to a shrink. I talk to the appointed Matt Fabian, a forensic psychologist. He said that I'm competent. I think I am competent, and I think I'm more competent than a lot of the feeble-minded people that they have that get taken advantage of by the system of

9

revenue generation. . . .

We're all watching NCIS and CSI and all this stuff that brainwashes us all with this bogus psychology, and we're all under its influence, that there's good guys and bad guys and some of us are good guys and there's—and there's bad guys out there we need to go after; and when really the so-called good guys are the ones making all the money off the drugs and that they're probably—your mutual funds and IRAs, they're laundering one-third of drug money in this country, and you don't even know it.

I think that everything is connected. I have—I have what we might call a gestalt view. . . . I'm interested in the gestalt theory of what's going on or gestalt reality, a cogent reality. Not a virtual reality. Not a reality that you can manifest or create on your own. I mean, the real reality out there that—that people—that you—the reality gets blocked by all of the celebrity gossip and sports statistics and Game of Thrones and your Facebook feed and your Twitter account, all this stuff that keeps people from knowing what's really going on in the world.

There is stuff that's really going on in this world, and I'm caught up into it, and it's brought me here, and it's brought us together, and it's all real I mean, I'm not going to pretend it isn't all connected, because there is a gestalt.

I don't have a linear view of things. I want to be able to see everything all at once and know what's going on, and that's why I'm here, because people who think like that, people who want to know what's going on in the world, want other people to know all of what's going on with the child prostitution and the blackmail and all of that, that's what puts people like me here, because I want to know what's going on and I want people to know what's going on. And it may seem—it may seem like some tangential leap or some sort of schizophrenia or something like that, but, no, there's a real world, and it's all connected.

My head—it's a psychology thing. They put me into this state. I'm—I'm impetuous right now. I'm very impetuous, and I'm very indignant, and it's because of the psychological state they prepared me for, that they put me in so I'll look like a crazy person.

I've about lost it . . . So I'm sure I come across as somebody that's a bit crazy.

I'm—I am at war. I don't want to be at war with the State or agents of the State . . . . These people have—I've got to do this. This is how I got to fight it. I

10

can't get out and—what am I supposed to do?  Get out and go get a gun?  That's exactly what they're trying to do is try to create a terrorist.  I'm not a terrorist.  I'm here to fight terrorists.  I'm here.

Rucker also called lawyers "scumbags" and "weasels" and characterized the judiciary as "corrupt," which offended several prospective jurors.  Throughout voir dire, members of the panel indicated that Rucker's presentation had made them highly uncomfortable, and they expressed concerns as to Rucker's ability to represent himself.  One prospective juror told Rucker, "I don't think you're going to get a fair trial.  I think this is going to stack against you, and it's going to be a farce."  Another prospective juror remarked, "[T]his is a travesty."  Another prospective juror asked the district court directly, "Is there a process by which the Court goes through to deem whether or not someone is able to represent themselves?"

After Rucker concluded his voir dire, standby counsel moved for a mistrial, arguing that Rucker was not competent to represent himself and that Rucker's presentation had "irrevocably tainted" the jury against him.  Counsel asked the district court to conduct a second *Faretta* hearing to determine if Rucker was competent to represent himself.  The district court asked for a response from the State.  The prosecutor responded, "Your Honor, I do believe that the discomfort that the panel was feeling was obvious. I believe the Court heard all of that discussion.  And we would defer to the Court and its opinion on this matter and how to move forward."  The district court then asked Rucker if he believed that he was competent to represent himself, and Rucker provided an ambiguous and rambling response.  Finally, the district court asked standby counsel whether he believed that Rucker was "competent to stand trial or not." Counsel responded:

11

In my opinion, Your Honor, this trial is not going to be about whether or not he committed the charges of aggravated assault by threat . . . . The question is going to be him tilting at windmills and talking about the conspiracy against him, and that raises serious concerns about his competency to stand trial. And it's also raising concerns about his competency to represent himself because the jurors themselves, a bunch of laypeople, saw what the problem is. . . .

Mr. Rucker . . . I am concerned that you are going to get convicted, either because you're incompetent to stand trial . . . or you're incapable of properly representing yourself, in that, because of things that you've said in the front of the jury and that you're not—[t]hat you're going to be convicted for all of the wrong reasons.

Rucker interjected:

Your Honor, I never asked to represent myself. I always said that I am myself. And I believe that it would imply a dissociative quality to represent myself. I would have to be two people, and I would be—it would imply some kind of mental illness that I don't have. And so I've never said—I never said that I am capable of representing myself. I don't believe someone—could be capable of representing themselves. . . .

As Rucker continued his monologue, the district court interrupted him and overruled counsel's

motion:

Okay. Let me—let me stop you right there, Mr. Rucker, because I'm not going to grant the motion. I'm going to allow you to finish the trial. I am going to go ahead and rely on the previous determination that the defendant is competent to stand trial.[**4**]

I believe the concerns being expressed by both sides here have to do with the

---

[**4**] Again, the record does not establish that any competency determination had been made. Although Rucker made statements to the panel during voir dire claiming that he had been found competent, no such finding appears in the record. Rucker's appointed counsel on appeal asked the district clerk's office to provide a supplemental clerk's record containing any competency evaluation that had been performed on Rucker. The district clerk's office replied with a letter stating that the record contained an Article 16.22 assessment, *see supra* n.1, "but does not contain any other documents regarding competency evaluations."

12

tactics the defendant is using and the way he wants to defend himself, and those are tactical decisions. As long as he's competent to stand trial, he can make whatever tactical decisions he wants, to his benefit or not, in someone else's opinion.

At the conclusion of trial, the jury found Rucker guilty of aggravated assault with a deadly weapon, and the district court placed him on community supervision as noted above. This appeal followed.

## DISCUSSION

### Right to counsel

We first address Rucker's second issue, in which he argues that he did not waive his right to counsel. Specifically, Rucker contends that his request to proceed pro se was "evasive and confusing, falling far short of the constitutional requirement" that a defendant's waiver of the right to counsel be "unequivocal and clear." Rucker argues in the alternative that even if he waived his right to counsel, he later withdrew that waiver.

We review a trial court's decision to allow or deny self-representation for an abuse of discretion. *See Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010); *Lathem v. State*, 514 S.W.3d 796, 816 (Tex. App.—Fort Worth 2017, no pet.); *Rodriguez v. State*, 491 S.W.3d 18, 28 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd); *Robinson v. State*, 387 S.W.3d 815, 820 (Tex. App.—Eastland 2012, no pet.); *DeGroot v. State*, 24 S.W.3d 456, 457–58 (Tex. App.—Corpus Christi-Edinburg 2000, no pet.). We view the evidence in the light most favorable to the trial court's ruling and imply any findings of fact supported by the record and necessary to affirm the trial court's ruling when the trial court did not make explicit findings. *See Rodriguez*, 491 S.W.3d at 28; *Robinson*, 387 S.W.3d at 820.

13

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. "The right to counsel at trial is regarded as fundamental." *Williams v. State*, 252 S.W.3d 353, 355–56 (Tex. Crim. App. 2008) (citing *Gideon v. Wainwright*, 372 U.S. 335, 343–44 (1963)). Representation by counsel "protects a defendant's right to a fair trial," "ensures that the prosecution's case is subjected to meaningful adversarial testing," and "safeguards the defendant's rights." *Id*. at 356. "An indigent defendant is therefore entitled to appointed counsel unless the defendant competently, intelligently, and voluntarily waives the right to counsel." *Id*. "'[C]ourts indulge every reasonable presumption against waiver' and . . . 'do not presume acquiescence in the loss of fundamental rights.'" *Id*. (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "To assess whether a waiver is effective, courts consider the totality of the circumstances." *Id*.

The Sixth Amendment also encompasses the right to self-representation. *See Faretta*, 422 U.S. at 818; *Williams*, 252 S.W.3d at 356. However, although "a defendant has a fundamental right to represent himself, representation by counsel is the standard, not the exception, and there is a strong presumption against the waiver of the right to counsel." *Lathem*, 514 S.W.3d at 802. "The Sixth Amendment embodies two competing rights because exercising the right to self-representation necessarily means waiving the right to counsel." *Id*. "Thus, while a criminal defendant's right to counsel stays in effect until waived, a defendant's right to self-representation is not triggered until it is asserted." *Id*.

Among other requirements, the defendant's assertion of his right to self-representation must be "clear and unequivocal." *Faretta*, 422 U.S. at 835; *Williams*, 252 S.W.3d at 356; *Lathem*, 514 S.W.3d at 802–03. "Further, the request must be unconditional and must

not be a calculated attempt to disrupt, subvert, obstruct, or delay the orderly procedure of the courts or to interfere with the fair administration of justice." *Lathem*, 514 S.W.3d at 802–03 (citing *Funderburg v. State*, 717 S.W.2d 637, 641–42 (Tex. Crim. App. 1986); *Blankenship v. State*, 673 S.W.2d 578, 585 (Tex. Crim. App. 1984); *Thomas v. State*, 550 S.W.2d 64, 68 (Tex. Crim. App. 1977)). Once the defendant clearly, unequivocally, and unconditionally asserts his right to self-representation, the trial court must inform the defendant about the "dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Williams*, 252 S.W.3d at 356 (quoting *Faretta*, 422 U.S. at 835). Thus, to be effective, a defendant's waiver of his right to counsel requires both a clear, unequivocal, and unconditional assertion of his right to self-representation, followed by the trial court's admonishments as to the dangers and disadvantages of self-representation. *See Faretta*, 422 U.S. at 835–36; *Williams*, 252 S.W.3d at 356; *Lathem*, 514 S.W.3d at 802–03; *see also Pease v. State*, No. 03–14–00512–CR, 2016 WL 2732132, at *3 (Tex. App.—Austin May 5, 2016, no pet.) (mem. op., not designated for publication) (reversing trial court's decision to allow defendant to represent himself when neither requirement was satisfied).

Here, Rucker does not argue that the district court failed to inform him of the dangers and disadvantages of self-representation. Instead, he argues that any assertion of the right to self-representation was not clear, unequivocal, and unconditional. On this record, we agree. Even when viewing the evidence in the light most favorable to the district court's ruling, we cannot conclude that Rucker clearly, unequivocally, and unconditionally asserted his right to self-representation. At one point during his arraignment, Rucker claimed that he "would be happy to go pro se," and at another point, he mused that he would be "better off being pro se rather than being represented by an attorney who is going to subvert [his] access to the Court."

15

However, at other points during the proceeding, Rucker made statements suggesting that his request to represent himself was motivated by nothing more than his dissatisfaction with appointed counsel. Thus, Rucker's request was conditioned upon the district court's refusal to appoint him different counsel. When Rucker first informed the district court that he and his appointed counsel had "irreconcilable differences," he told the district court that he "would rather have a different attorney, an attorney of [his] choice." Later, when the district court informed Rucker that he had a right to appointed counsel, Rucker responded, "Your Honor, I would like—if I have a right to an attorney, I should have a right to an attorney." When the district court asked Rucker directly and repeatedly if he wanted to represent himself, Rucker provided confusing and evasive answers, such as "I would be myself in court" and "I want to be me in court. I'm not a lawyer. I'm not an attorney. I am me." Rucker also claimed that representing himself would imply "a dissociative quality" or "mental disorder" that he did not possess and questioned whether it would be possible for him to represent himself. Furthermore, when the district court presented Rucker with a written waiver of his right to counsel and asked him to sign it, the court again inquired as to whether Rucker wanted to represent himself. Rucker responded, "I would consider assistance of counsel of someone to give me legal counsel of some of the processes, but I don't want somebody to be filing motions or moving the Court on my behalf." Finally, near the end of the arraignment, Rucker informed the district court, "I don't think I'm going to sign the waiver" of his right to counsel. When the district court responded that it had entered the waiver on Rucker's behalf, Rucker replied, "I'm not waiving my right to an attorney." Considering the totality of the circumstances and indulging every reasonable presumption against waiver as we must, Rucker's statements do not amount to a clear, unequivocal, and unconditional assertion of his right to self-representation, and the district court

16

abused its discretion to conclude otherwise. *See, e.g.*, *Renfro v. State*, 586 S.W.2d 496, 500 (Tex. Crim. App. 1977) (concluding that although defendant requested to represent himself at one point, totality of record demonstrated that request "was based solely on the court's refusal to appoint different counsel and not because he wished to forego his right of representation"); *Robles v. State*, 577 S.W.2d 699, 704 (Tex. Crim. App. 1979) ("A request for other counsel is not a waiver of the right to counsel."); *Robinson*, 387 S.W.3d at 821 ("Appellant's dissatisfaction with appointed counsel and his request for hybrid representation did not establish a clear and unequivocal assertion of his right to self-representation."); *DeGroot*, 24 S.W.3d at 458–55 (concluding that defendant's statement to district court, "I think I'll proceed without an attorney" was not clear and unequivocal assertion of right to self-representation because it could not "be taken alone or out of context" of defendant's dissatisfaction with his attorney); *see also Pease*, 2016 WL 2732132, at *2–3 (concluding that defendant did not clearly and unequivocally assert right to self-representation when request to proceed pro se was conditioned on presence of standby counsel).

Because Rucker did not clearly, unequivocally, and unconditionally assert his right to self-representation, his right to counsel remained intact. *See Williams*, 252 S.W.3d at 358. Consequently, Rucker was entitled to be represented by counsel during trial but was not. *See id*. "When the right to trial counsel has been violated, prejudice is presumed because the trial has been rendered inherently unfair and unreliable." *Id*. at 357. Because "there is simply no way to discern what the outcome would have been had [Rucker] been represented by counsel," the district court's decision to permit Rucker to proceed without representation constitutes reversible error, not subject to a harm analysis. *See id*. at 358; *Pease*, 2016 WL 2732132, at *3.

17

We sustain Rucker's second issue.  Accordingly, we need not consider his third, fourth, and fifth issues related to competency.[5]  *See* Tex. R. App. P. 47.1; *Pease*, 2016 WL 2732132, at *4.

**Sufficiency**

Even though we have determined that Rucker was denied his right to counsel and thus is entitled to a new trial on that ground, we must also address his first issue, in which Rucker asserts that the evidence is insufficient to support his conviction.  This is because a sufficiency challenge, if sustained, would result in an acquittal and bar retrial as a matter of law.  *See Burks v. United States*, 437 U.S. 1, 15–18 (1978); *Greene v. Massey*, 437 U.S. 19, 24–25 (1978).  Thus, "a challenge to the sufficiency of the evidence should be considered before disposing of a case even though reversal may be based on another ground."  *Graham v. State*, 643 S.W.2d 920, 924 (Tex. Crim. App. 1981).

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt."  *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "We view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted."  *Id*.  "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses."  *Id*.  "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial."  *Id*.  "When the record supports conflicting inferences, we presume that the

---

[5] Although we need not address competency at this time, we note that Rucker's standby counsel and the State both raised the issue of Rucker's competence to stand trial.  Nevertheless, the record does not reflect that any determination of competency was made, even though the district court stated it "rel[ied] on the previous determination that the defendant is competent to stand trial."

jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

As charged in the indictment, a person commits the offense of assault if he intentionally or knowingly threatens another with imminent bodily injury. Tex. Penal Code § 22.01(a)(2). The offense is aggravated if a person uses or exhibits a deadly weapon during the commission of the assault. *Id*. § 22.02(a)(2). Rucker claims that there was no evidence that he threatened Gonzalez with "imminent" bodily injury and no evidence that he used or exhibited a deadly weapon during the commission of the assault.

We first address whether there is sufficient evidence that Rucker threatened Gonzalez with "imminent" bodily injury. Although the Texas Penal Code does not define "imminent," the Court of Criminal Appeals and this Court have defined the term to mean "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012); *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989); *Millslagle v. State*, 81 S.W.3d 895, 898 (Tex. App.—Austin 2002, pet. ref'd). Thus, "imminent" bodily injury requires a threat of present rather than future harm. *Devine*, 786 S.W.2d at 270.

According to Rucker, the evidence showed that he made, at most, a "future threat" toward Gonzalez, i.e., that he would cut her *if* she did not leave him alone or *if* she came onto what Rucker believed to be his property. Rucker contends that because he was standing thirty feet away from Gonzalez when he made his threat, and because Gonzalez went back inside the Jiffy Lube immediately after Rucker threatened her, she was never in any danger of imminent bodily injury.

19

The jury could have reasonably inferred otherwise. Gonzalez testified that when Rucker threatened her, he was in an agitated, angry state, cussing and screaming at her and "coming toward her" while he was holding the knife out in front of him. When asked to describe how Rucker was holding the knife, Gonzalez testified, "Holding the knife towards me like if he was going to stab me with it, but as he was walking towards me." Moreover, one of the arresting officers testified that a person armed with a knife can be an imminent threat to a person even when standing forty to fifty feet away, and another officer testified that by the time a suspect armed with a knife is twenty feet away from a person, it might be too late for the person to defend against the attack, depending on the suspect's demeanor, speed, and intent. The jury could have reasonably inferred from this evidence that even though Rucker was thirty feet away from Gonzalez, the threat of bodily injury to Gonzalez was imminent because he was in an agitated state, coming toward her with a knife, and threatening to cut her. The fact that Gonzalez was able to retreat to safety inside the shop after the threat was made does not make the threat any less imminent when it was made.

Furthermore, the jury could have found that the words Rucker used to threaten Gonzalez were not conditional. Although at one point during cross-examination Gonzalez agreed with Rucker that he had threatened to cut her "if" she came onto his property, at other points she described it in less conditional terms, testifying that Rucker "said he was going to cut me because we keep bothering him and messing with his home," and that he told her, "I am going to fucking cut you." The jury as factfinder was entitled to resolve these inconsistencies in favor of the State's theory that Rucker was threatening imminent harm to Gonzalez, particularly in light of Gonzalez's testimony that Rucker was not calmly standing in place but was yelling and screaming and walking toward her with a knife.

20

Moreover, even assuming that Rucker's threat was conditioned upon Gonzalez coming onto what Rucker believed to be his property, a threat can be both conditional and imminent. For example, when an assailant approaches the victim and threatens the victim with immediate harm if the victim does not comply with the assailant's orders, the threat of bodily injury is imminent. *See Devine*, 786 S.W.2d at 270 (citing *Green v. State*, 567 S.W.2d 211, 212 (Tex. Crim. App. 1978)). In this case, the jury could have reasonably inferred that the threat was imminent because at the time Rucker threatened to cut Gonzalez, she was standing near the area that Rucker believed to be his property; Rucker was in an angry, agitated state and approaching Gonzalez armed with a knife; and, based on the officers' testimony relating to their experience of dealing with suspects from a distance, Rucker was close enough to Gonzalez to pose a threat of immediate harm. Viewing these circumstances in their totality and in the light most favorable to the verdict, we conclude that the evidence is sufficient to prove that the threat of bodily injury to Gonzalez was imminent.

We next address whether the evidence is sufficient to support the jury's finding that a deadly weapon was used during the commission of the offense. As charged in the indictment, a deadly weapon is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B). "Bodily injury" means "physical pain, illness, or impairment of physical condition." *Id*. § 1.07(a)(8). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. § 1.07(a)(46). "The statutory language is exceedingly broad in that a 'deadly weapon' may be 'anything,' and there is no limitation as to what type of thing may be considered a deadly weapon." *Prichard v. State*, 533 S.W.3d 315, 320 (Tex. Crim.

21

App. 2017). Additionally, the statute's "plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000).

"[E]xpert testimony is not required to prove that a weapon is deadly," and "no one needs to testify to the conclusion that the weapon was capable of producing serious bodily injury." *Williams v. State*, 575 S.W.2d 30, 32 (Tex. Crim. App. 1979). "The jury is free to consider all of the facts of the case, including any actual wounds inflicted or words spoken by the appellant, in deciding if the weapon is deadly." *Id*. Moreover, "[i]n determining whether a weapon is deadly in its manner of use or intended manner of use, the defendant need not have actually inflicted harm on the victim." *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017) (citing *Brown v. State*, 716 S.W.2d 939, 946 (Tex. Crim. App. 1986)). "Instead, we consider words and other threatening actions by the defendant, including the defendant's proximity to the victim; the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon; and the manner in which the defendant used the weapon." *Id*. "These, however, are just factors used to guide a court's sufficiency analysis; they are not inexorable commands." *Id*.

Rucker argues that the knife in this case was not capable of causing death or bodily injury because Rucker was thirty feet away from Gonzalez at the time he threatened her; Gonzalez did not suffer any injury; Rucker threatened only to "cut" Gonzalez, which may or may not cause serious bodily injury; the knife, as a "basic folding pocketknife," had only a three-inch blade and was designed to be a tool rather than a weapon; and Rucker did not "make any slashing, stabbing, or swiping motions with the knife" so as to suggest that he intended to cause

22

Gonzalez serious bodily injury. Rucker also incorporates his earlier arguments regarding imminence, claiming that he only threatened future harm to Gonzalez and that he did not follow her into the Jiffy Lube, indicating that he did not intend to cause her seriously bodily injury.

However, Rucker's arguments view the evidence in the light most favorable to his defense. When viewing the evidence in the light most favorable to the verdict, as we must, the evidence shows that Rucker was coming toward Gonzalez while holding a knife that an officer testified had a "single fixed non-serrated blade" that was capable of both cutting and stabbing. The knife was admitted into evidence, enabling the jury to assess for itself the physical characteristics of the knife. *See Robertson v. State*, 163 S.W.3d 730, 733 (Tex. Crim. App. 2005) (concluding that reviewing courts should consider "not just the testimony concerning the knife, but the knife itself, in determining whether the evidence adduced at trial was constitutionally sufficient to support" deadly weapon finding). Moreover, officers provided testimony, summarized above, on the imminence of the threat, and the jury could have reasonably inferred from this evidence that Rucker's knife could pose a threat of serious bodily injury to Gonzalez even from thirty feet away, depending on Rucker's demeanor, speed, and intent while holding the knife. Here, the jury heard evidence that Rucker was angry, yelling, and cussing as he approached Gonzalez and that he threatened to cut her. Gonzalez testified that Rucker was holding the knife "towards [her] like if he was going to stab [her] with it." Gonzalez further testified that she was "scared for [her] life" and for the life of the 16-year-old girl who was with her. Based on the totality of the circumstances, including the physical characteristics of the knife; Rucker's words, actions, and demeanor during the encounter; the manner in which Rucker held the knife as he approached Gonzalez; and Gonzalez's reaction to Rucker's threat, the jury could have reasonably inferred that Rucker used the knife in a manner that was capable

23

of causing Gonzalez serious bodily injury or death. *See McCain*, 22 S.W.3d at 503 (concluding that "the mere carrying of" knife could be sufficient under certain circumstances to support deadly weapon finding); *Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref'd) (concluding that pocketknife was capable of causing death or serious bodily injury); *Rogers v. State*, 877 S.W.2d 498, 500 (Tex. App.—Fort Worth 1994, pet. ref'd) (evidence that supported deadly weapon finding included victims' fearful reactions to defendant's use of pocketknife); *see also Lozoya v. State*, No. 08-15-00278-CR, 2017 WL 4277307, at *4 (Tex. App.—El Paso Sept. 27, 2017, no pet.) (not designated for publication) (concluding that "[e]ven a small pocketknife or folding knife can be considered a deadly weapon" under certain circumstances, including "when the defendant makes threats while using the knife"). On this record, we conclude that the evidence is sufficient to prove that Rucker used a deadly weapon during the commission of the offense.

Because the evidence is sufficient to support Rucker's conviction, he is not entitled to rendition of an acquittal. We overrule Rucker's first issue.

## CONCLUSION

Having concluded that the record does not support the district court's finding that Rucker clearly and unequivocally asserted his right to self-representation so as to waive his right to counsel, we reverse the district court's judgment of conviction and remand for a new trial.

_____

Gisela D. Triana, Justice

24

Before Justices Goodwin, Triana, and Kelly

Reversed and Remanded

Filed: February 11, 2021

Do Not Publish